**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| JOSHUA ROBERTS and DEBORAH CHONG, Individually and as Next Friend N.R., their Minor Child, | : : : : |
| Plaintiffs, | : Case No. 3:19-CV-00202 : : District Judge Thomas M. Rose |
| v. | : : Magistrate Judge Sharon L. Ovington |
| UNITED STATES OF AMERICA, | : : |
| Defendant. | : |

**GUARDIAN AD LITEM'S REPORT TO THE COURT REGARDING
PROPOSED SETTLEMENT FOR N.R., A MINOR**

TO THE HONORABLE MAGISTRATE JUDGE OVINGTON:

NOW COMES, Michael A. Renne, the Court-Appointed Guardian Ad Litem for N.R., in the above-entitled and numbered cause, and files this Guardian Ad Litem's Report to the Court Regarding Proposed Settlement for N.R.

**I.    BACKGROUND FACTS AND LITIGATION**

A.    OVERVIEW.  This action was initiated by Joshua Roberts and Deborah Chong, individually and as Next Friend of N.R., against the United States of America under the Federal Tort Claims Act for monetary damages for personal injuries arising from events occurring before and during the birth of N.R. on November 26, 2014, at Bassett Army Community Hospital ("BACH"), in Wainwright, Alaska.  Joshua Roberts and Deborah Chong are the parents of N.R.  Deborah Chong is the legal Guardian of N.R.'s Estate by virtue of appointment by the Probate Division of the Court of Common Pleas of Greene County, Ohio, on January 23, 2019.  The undersigned attorney was appointed Guardian Ad Litem for N.R. by Order signed on March 10, 2021 and filed of record on March 11, 2021, by the Honorable Magistrate Judge Sharon L. Ovington, in the above-entitled and numbered cause.

B.    PLAINTIFFS' ALLEGATIONS.  Plaintiffs alleged that the medical care providers at BACH failed to properly care for N.R. and his mother, Plaintiff Deborah Chong, beginning on November 23, 2014 and continuing until about ten minutes after his birth on November 26, 2014.  All persons involved in the medical and health care services provided to Plaintiff Deborah Chong at BACH were agents, servants, or employees of the United States Department of the Army, the United States of America, or some agency thereof, and were at all material times acting within the course and scope of such employment thus making the proper defendant in the case the United States of America under the FTCA.  Plaintiffs claim that the agents of the United States of America provided substandard medical care to Deborah Chong and

her fetus, including but not limited to failure to advise Ms. Chong to come into Labor and Delivery ("L&D") at BACH on November 23, 2014 when she called in reporting ruptured membranes, failure to monitor appropriately and timely intervene for non-reassuring fetal heart rate status, failure to regulate Pitocin properly, failure to perform amnioinfusion therapy for the presence of thick meconium, failure to recognize and timely intervene for arrest of descent and prolonged labor, failure to recognize severe molding and caput formation during labor, failure to timely perform a cesarean section, and failure to remove all meconium from below the cords of N.R. prior to utilizing positive pressure ventilation.

1. Ms. Chong reported that she initially called about rupture of her membranes on November 23, 2014 at Noon, but was told that if the leaking did not continue, she could stay home. She presented to L&D at BACH on November 25, 2014 at 9:15 a.m. and was admitted for prolonged rupture of membranes ("ROM"). The plan was to start Pitocin in the face of prolonged ROM. During labor, Ms. Chong exhibited thick meconium, arrest of descent, and chorioamnionitis. She underwent a cesarean section at 12:47 p.m. on November 26, 2014. She was discharged two days later against medical advice in order to get on a plane to see her baby who had been transferred to Anchorage.

2. N.R. was born through thick meconium and with metabolic acidosis. His initial Apgar score was only 1, for the presence of a heart rate. That increased to a score of 4 in five minutes for a heart rate now over 100, and +1 for color and respiratory effort. N.R. was initially intubated and suctioned of thick meconium with chunks below his (vocal) cords. The endotracheal tube used for this suctioning was removed prior to all of the meconium being suctioned out which was evidence by the fact that his oxygen saturation remained below 60% until he was reintubated and another thick meconium plug was removed from below his cords. After that time, he recovered some respiratory effort, although was still in respiratory distress from meconium aspiration syndrome. His admission exam to the nursery was of a slightly pale infant with overriding sutures and significant caput and increased work of breathing. Blood cultures obtained that day revealed no growth after five days and blood gases revealed him to be in metabolic and respiratory acidosis.

3. N.R. was transferred on November 27, 2014 to Providence Alaska Medical Center for a higher level of care. He began having seizures at about six hours of life, for which he was given multiple medications to alleviate. His birth records reveal that his weight, length, and head circumference were all within normal variation. His newborn screening tests were all normal. Due to his perinatal depression, seizures, metabolic acidosis, and meconium aspiration, he was a candidate for whole body cooling in an attempt to alleviate at least some of his assumed brain injury. He required ventilatory support for five days, was given antibiotics but showed no evidence of infection, was kept NPO (nothing by mouth) for many days, and had a transient hypothyroidism and renal dysfunction. He was discharged to home on December 17, 2014.

   4.  An MRI of N.R.'s brain was performed on December 10, 2015, almost a year after his birth. It revealed extreme cerebral encephalomalacia with preservation of central gray matter which is often thought to be secondary to prolonged partial severe hypoxia and ischemia. Notes indicated it could be due to anoxia or an inflammatory process. By May 16, 2016, N.R. had been diagnosed with spastic quadriplegic cerebral palsy, microcephaly (acquired), and global developmental delays.

  C. FUTURE CARE NEEDS. N.R. sustained injuries of a serious and permanent physical and emotional nature. He sustained a hypoxic-ischemic brain injury which left him with mixed asymmetric quadriplegic cerebral palsy, severe oral motor deficits impacting feeding and speech, severe speech and language deficits, severe vision impairment, microcephaly, cognitive impairment, and deficits in all aspects of self-help skills which will limit his ability to take care of himself. He will require assistance on a consistent and increasing basis in the future.

   1.  According to the expert report of Stephen T. Glass, M.D., P.S., a neurological expert retained by Plaintiffs, N.R. will require at least the following services:

    a.  Comprehensive multidisciplinary rehabilitation support for the remainder of his life.

    b.  Yearly speech and language, occupational, physical therapy, augmentative, and feeding evaluations.

    c.  Direct speech and language therapy, physical and occupational, and feeding therapy multiple times per week.

    d.  Continued supplemental gastrostomy feedings now but with the goal of enhancing oral feeding directly, glycopyrrolate to assist in drooling control, and periodic videofluoroscopy of swallowing will be needed.

    e.  Continued medications including omeprazole, glycopyrrolate, and MiraLax.

    f.  Yearly CBC with differential, platelet count, AST, ALT, and vitamin D level.

    g.  Continued bilateral high calf AFOs; also consider use of SPIO.

    h.  Equipment needs will continue including a standing frame, gait trainer, bilateral AFOs, bath chair, a Tomato chair, and wheelchair.

    i.  N.R. may also benefit from a power chair in the future depending on his progress in visual function, attention span, and sensorimotor control.

    j.  With advancing years and increased physical size, the family will also require a Hoyer lift and likely a ceiling track system, widened hallways, grab

        bars, and also an adapted bathroom and other spaces within the home to best facilitate the best care.

        k.     Home modifications will also be needed to allow special needs access, wheelchair access by using ramps, widened spaces, storage room for equipment needs, etc.

        l.     Periodic ophthalmology, gastroenterology, nutrition, dental, pulmonary, orthopedic, and neurologic evaluations.

        m.     Ongoing psychological/behavioral support to assist the family in developing and cultivating the best environment to meet N.R.'s anticipated behavioral needs and challenges recognizing the impact that his developmental disorder and communication impairment has on later behavioral functioning.

    2.     According to the Life Care Plan and Cost Analysis for N.R. prepared by Dan M. Bagwell, BSN, RN, CLCP, CCM, DCMS, a life care planner retained by Plaintiffs, the cost to care for N.R. for the remainder of his expected life to age 52 or 53 will be approximately $28M.

    D.     **DEFENDANT'S DEFENSE.** This case was vigorously defended by the United States of America. The United States of America denied all liability and argued there were independent, pre-existing, and superseding causes of injury.

    E.     **N.R.'S CURRENT CIRCUMSTANCES.** N.R. is now six years old and continues to live with his parents, who provide the bulk of his care. He is entirely dependent on others for mobility, dressing and undressing, bathing, personal hygiene, toileting, and all decision making. He suffers from quadriplegic cerebral palsy and is unable to move or stand or sit independently for more than 5-10 minutes. He requires the use of a feeding tube for nutrition, and he continues to suffer from severe speech and language deficits, severe vision impairment, microcephaly, and cognitive impairment.

    The family moved from Ohio to Colorado in January of 2020. N.R.'s father, Joshua, is in the Air Force and currently works as a medic to Air Force Cadets at the Air Force Academy in Colorado Springs. His rank is that of Master Sargent E-7. He currently earns about $6,000 each month. N.R.'s mother, Deborah, takes care of N.R. and his two siblings (ages 3 and 1) at home and is not employed outside the home. The family has medical insurance through Tricare (through Joshua's employment with the government). In addition, N.R. has Medicaid coverage through a Medicaid waiver program.

4

## II.  PROPOSED SETTLEMENT

A.  SUMMARY.  The parties reached a resolution of the case for $7,860,000.  In accordance with the terms of the Stipulation for Compromise Settlement and Release of Federal Tort Claims Act Claims Pursuant to 28 U.S.C. § 2677, a copy of which is attached hereto as Exhibit A, the parties agreed to allocate half of that amount, totaling $3,930,000, to a Reversionary Trust for N.R., $300,000 in cash, and $3,630,000 to purchase a structured settlement annuity which will fund the trust into the future.  The other half of the gross settlement is to be used to pay attorney fees ($1,965,000), attorney expenses and advancements ($134,157), liens (none), parental claims ($100,000 each parent), with the remainder ($1,630,843) going to a special needs trust for the benefit of N.R.

B.  REVERSIONARY TRUST.  The Irrevocable Reversionary InterVivos Grantor Medical Care Trust for the Benefit of N.R. (the "Reversionary Trust") is attached hereto as Exhibit B[1].  The Trustee of the Reversionary Trust is Settlement Trust Group/Midland States Bank, which has substantial experience in the administration of these type of trusts.

1.  The Reversionary Trust is designed to pay for N.R.'s future medical care related to the claims.  In addition to medical care, it provides allowances for in-home attendant care (up to 10 hours per day until age 22, then up to 24 hours care per day), residential facility care, therapy services, transportation expenses, including a motor vehicle allowance (initial maximum $20,000 and $35,000 every 7 years thereafter), home modifications ($100,000 lifetime), case management, and other items and services.  The Reversionary Trust is a typical vehicle used by the United States in settlement of tort claims (it is called a "reversionary" trust because the funds remaining in the trust at N.R.'s death revert back to the government).  However, the benefits of the trust for each beneficiary vary significantly from case to case.  Those terms are subject to negotiation between the parties.  The final terms of this trust were the result of hard bargaining between counsel for each party.  The terms of this Reversionary Trust as finally agreed upon are favorable to N.R.

2.  In additional to the $300,000 initial deposit, the Reversionary Trust will be funded with a structured settlement annuity contract purchased for $3,630,000 from Berkshire Hathaway Life Insurance Company of Nebraska.  Berkshire is one of the highest rated structured settlement annuity providers in the market.  The annuity will provide payments of $6,018 per month (over $72,000 per year) for the remainder of N.R.'s life, increasing at 2% compounded annually.  The internal rate of return for the annuity is 3.34%, which is a good rate in the current low interest rate environment.  An affidavit from the structured settlement broker Dave Hickey setting forth this information is attached hereto as Exhibit C.

3.  The Guardian Ad Litem approves of the form and substance of the Reversionary Trust and believes it is in the best interest of N.R.

---

[1]  Exhibits B, C, and D have been redacted to remove the name and other personal identifiers for N.R.  The Guardian Ad Litem will file unredacted copies under seal at the request of the Court.

C. ATTORNEY FEES AND EXPENSES.  Pursuant to the contingency fee contact between Plaintiffs' and their attorney, and as limited by the Federal Tort Claims Act, Plaintiffs' attorneys are entitled (i) to a 25% fee, which is $1,965,000, for their work in obtaining this recovery, and (ii) to reimbursement for expenses and advancements in the amount of $134,157.  This case was vigorously defended by the United States of America and it required extensive legal services and expenses for experts and prosecution of the case.  When taking into account the time and labor required, the difficulty of the legal and factual questions involved, the skills necessary to handle such a case, and the customary fees for such services, and after reviewing the itemized list of expenses and advancements, the Guardian Ad Litem believes that the 25% contingency fee agreement ($1,965,000) of Whitehurst, Harkness, Brees, Cheng, Alsaffar, Higginbotham & Jacob, PLLC, and the $134,157 reimbursement for expenses and advancements, are appropriate and reasonable.

D. LIENS.  Counsel for Plaintiffs reports that there are no lien or subrogation amounts required to be paid from the settlement proceeds.

E. PARENTAL ALLOCATION.  The family and their attorneys have reached an allocation agreement whereby N.R.'s mother, Deborah Chong, will receive $100,000 of the settlement proceeds for her claims, and N.R.'s father, Joshua Roberts, will receive $100,000 of the settlement proceeds for his claims.  The Guardian Ad Litem believes this is reasonable and appropriate under the circumstances.

F. SPECIAL NEEDS TRUST.  In January of 2019, pursuant to Order of the Probate Division of the Court of Common Pleas for Greene County, Ohio, a special needs trust was created to hold and to administer net settlement proceeds for N.R.  The undersigned drafted that trust.  A copy of that Order and the special needs trust are attached hereto as <u>Exhibit D</u>.

    1. First National Trust Company (FNTC) is the Trustee of the special needs trust, and National Distribution Consultants (NDC) is the Distribution Director.  NDC is a national organization which specializes in the administration of special needs trusts, has extensive experience in special needs trust administration, and has an excellent reputation in the community of special needs planners.  The Guardian Ad Litem has worked with NDC and FNTC on many occasions and heartily endorses the professionalism and expertise they bring to this situation.

    2. The purpose of a special needs trust is (i) to preserve a beneficiary's access to Medicaid and other government programs, and (ii) to provide a vehicle for the management and protection of settlement funds.  The special needs trust established for N.R. achieves these purposes.  It was, however, established under Ohio law at the time when N.R. and his family lived in Ohio.  It will need to be modified to conform with the differing requirements of Colorado Medicaid regulations, where the family now lives.  The trust has a provision which allows for such amendments (Article 4.4) and the process to complete those modifications has been initiated and is expected to conclude shortly.

    3. The Guardian Ad Litem approves of the form and substance of the special needs trust and believes it is in the best interest of N.R. for his net settlement proceeds of $1,630,842 to be deposited into and administered in this trust.

**III.	GUARDIAN AD LITEM'S RECOMMENDATION TO THE COURT**

　　A.	RECOMMENDATION.  The matter addressed by this report is whether the proposed settlement is in the best interest of N.R.  Based on the totality of circumstances, the undersigned attorney is of the opinion that the proposed settlement is in the best interest of N.R. and recommends to the Court that it be approved.  The trust agreements for N.R., as set out more specifically in this report, are well designed and in the best interest of N.R.  The allocation of the settlement proceeds for payment of liens, fees, and expenses are appropriate.  The legal fees and expenses are reasonable considering the complexity of the case, the amount of legal work performed, and the expenses incurred in developing the case.  This case has been diligently prosecuted and defended.  It is with no hesitation that I recommend to the Court that the settlement as outlined herein be approved on behalf of N.R.

　　B.	PARENTS' CONSENT.  I have reviewed the settlement in detail with the parents of N.R.  They understand its terms and agree that it is in the best interest of N.R.

　　C.	APPROVAL OF PROBATE COURT.  In January of 2019, a prior agreement to settle this matter was reviewed and approved by the Probate Division of the Court of Common Pleas for Greene County, Ohio.  It was found by that court to be in the best interest of N.R.  That agreement fell through but the terms of the settlement at issue today are very similar to the terms of the aborted settlement, including allocation of settlement proceeds to both a reversionary trust and special needs trust.

　　D.	GUARDIAN AD LITEM'S BACKGROUND.  The Guardian Ad Litem is an attorney practicing in the subject matter of estates, trusts, and personal injury settlements in the State of Ohio, with extensive education, training, and experience in the creation and management of special needs trusts and the settlement of personal injury actions, including allocation of settlement proceeds.  The undersigned is frequently retained to advise on the most appropriate allocation of settlement proceeds and to provide an independent assessment of the settlement.  During the undersigned's 30-plus years of practicing in this area, he has been involved in the finalization of hundreds of personal injury cases, including determinations on the allocation of settlement proceeds and the establishment or administration of hundreds of special needs trusts.

　　D.	MATTERS REVIEWED.  In making this recommendation, the undersigned attorney has reviewed the pleadings in this case, the reports of the various experts on liability and damages, medical records, the probate documents filed in the Probate Division of the Court of Common Pleas for Greene County, Ohio, the Stipulation for Compromise Settlement and Release of Federal Tort Claims Act claims pursuant to 28 U.S.C. § 2677, the Irrevocable Revisionary InterVivos Grantor Medical Care Trust for the benefit of N.R., and the Irrevocable Special Needs Trust created in January 2019 for the benefit of N.R.  In addition, the undersigned has conducted numerous interviews and discussions with trial counsel and with the parents of N.R. dating back to 2018, including personal meetings at the home of N.R. in Ohio and, most recently, several telephone conversations with N.R.'s parents in Colorado.  The undersigned has also arranged with Colorado counsel for the modification of the special needs trust in order to meet Colorado Medicaid regulations.

WHEREFORE, the undersigned Guardian Ad Litem believes that the proposed settlement is in the best interest of N.R. and recommends that the proposed settlement be approved by the Court.  It is the opinion of the Guardian Ad Litem that no hearing is necessary on behalf of N.R.  However, the Guardian Ad Litem stands ready, willing, and able to respond to any questions that the Court may have with regard to the settlement and will appear before the Court at any designated time if the Court determines a hearing is necessary.

    Respectfully submitted,

*/s/ Michael A. Renne*
Michael A. Renne  (0039382)
DINSMORE & SHOHL LLP
191 W. Nationwide Blvd., Suite 300
Columbus, Ohio  43215
Phone:    614.628.6880
Fax:    614.628.6890
Email:    michael.renne@dinsmore.com

*Court-Appointed Guardian Ad Litem*

20718022v2